UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

W.S. AND L.S. ON BEHALF OF C.S.,

                Plaintiffs,                     05 Civ. 8025 (CM)(MDF)

    -against-


RYE CITY SCHOOL DISTRICT,

                Defendant.


_____x

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S
CROSS- MOTION FOR SUMMARY JUDGMENT DISMISSING CASE

McMahon, J.:

        C.S., an autistic child, by her parents, has filed a complaint seeking "modified de novo review" of a decision of a State Review Officer (SRO) dated May 16, 2005. That decision affirmed a February 24, 2005 decision by an Impartial Hearing Officer (IHO), which had concluded that Defendant Rye City School District's Individualized Educational Plan (IEP) for the 2004-05 school year was reasonably calculated to provide C.S. with a free and appropriate public education (FAPE) for that year. The parents disagreed with the IEP and unilaterally enrolled their daughter at the Deveraux Millwood Learning Center, a private institution, for which they paid tuition. They also seek reimbursement for the cost of certain supplemental therapies and interventions that C.S. received during the 2004-05 school year.

        The parents move for a modified *de novo* review of the SRO's decision, and the defendant District cross-moves for summary judgment dismissing the complaint.

        Giving appropriate deference to the facts found by the IHO and SRO, and perceiving no error of law whatever, I grant the District's cross-motion, affirm the administrative findings, and dismiss the complaint.

**Standards to be Applied to Review of IDEA Administrative Decisions**

        Plaintiffs who bring suit under the Individuals with Disabilities in Education Act (IDEA) must first exhaust the administrative remedies available to them under the statute. A party who disagrees with his child's Individualized Family Service Plan (IFSP) or other decisions made regarding services for their child must request an impartial due process hearing before the state

or local educational agency. See 20 U.S.C. §§ 1415(f), (l). For children in New York's Early Intervention Program (EIP), this means a parent or guardian must initially seek review of her child's placement through an impartial due process hearing conducted before an administrative law judge. See N.Y. Pub. Health Law § 2549. Only after the administrative procedures are exhausted may an aggrieved parent seek court review of the adequacy of the IFSP. See Riley v. Ambach, 668 F.2d 635, 640 (2d Cir. 1981); Heldman v. Sobol, 962 F.2d 148, 158 (2d Cir. 1992); Mrs. W. v. Tirozzi, 832 F.2d 748 (2d Cir. 1987); Hope v. Cortines, 69 F.3d 687 (2d Cir. 1995). The "failure to exhaust deprives a district court of subject matter jurisdiction over the [action]." Engwiller v. Pine Plains Cent. Sch. Dist., 110 F. Supp. 2d 236, 245 (S.D.N.Y. 2000).

As to the 2004-05 school year, plaintiffs have exhausted their administrative remedies. They have received a decision from both an IHO and a State Review Officer.

The SRO's decision is subject to independent judicial review. However, as the United States Supreme Court has cautioned, this fact "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities..." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982). Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. Walczak v. Florida Union Free Sch. Dist., 142 F. 3d 119, 129 (2d Cir. 2001).

As the Second Circuit noted in Walczak, deference is particularly appropriate where, as here, the state hearing officers' review has been thorough and careful. In this regard, I must note that the decisions of both the IHO and SRO explore the evidence thoroughly, make detailed factual findings that are supported by the evidence, and cogently explain the reasons for the conclusions they reach. The SRO's decision is  well-reasoned and well-supported by citations to relevant portions of the record. It is owed the degree of deference I am expected to give it.

Where, as here, we are dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A board of education may be required to pay for educational services obtained for a student by his or her parent, if (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim. Burlington Sch. Comm. v. Dept. of Educ., 471 U.S. 359 (1985). Traditionally in this Circuit, the district bore the burden of proof on the first issue and the parents bore the burden of proof on the others. M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F. 3d 96, 102, 104 (2d Cir. 2000). However, the United States Supreme Court has recently ruled that the party who requests an impartial hearing bears the burden of proving that the services offered by the Board were inadequate. Schaffer v. West, 126 S. Ct. 528 (2005). Although the Supreme Court stated that this requirement applied equally to whatever party sought to challenge the IEP, it is inconceivable that the school district will ever challenge an IEP that it devises. This means, as a practical matter, that in this case the burden of proving the *inadequacy* of the IEP rests on the parents.

2

The IEP in this case was reviewed by the IHO and the SRO using pre-<u>Schaffer</u> standards (i.e., placing the burden on the school district to demonstrate the adequacy of the IEP, rather than placing on the parents who challenged the IEP the burden of proving the inadequacy of the IEP). However, that does not mean that this court can ignore <u>Schaffer</u> in reviewing the administrative decisions. In this lawsuit, it is the plaintiff-parents' burden to demonstrate that the administrative decision was wrong because the IEP was inadequate. The parents cannot prevail by arguing that the school District failed to meet the pre-<u>Schaffer</u> burden of proof at the administrative level.

The parents can satisfy their burden of proving that the District's plan did not afford their child a FAPE by establishing either (1) that the state did not comply with the procedural requirements of IDEA; or (2) that the challenged IEP was not "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, *supra*, 458 U.S. at 206-07.

Procedural flaws do not automatically require a finding of a denial of a FAPE, but procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE. <u>Knable v. Bexley City Sch. Dist.</u>, 238 F. 3d 755, 766 (6th Cir. 2001), *cert. denied*, 533 U.S. 950 (2001).

In this case, the parents allege two procedural flaws: namely, failure by the defendant District to administer a test known as an Functional Behavioral Assessment (FBA) on the child; and failure by the District to send out packets to alternative, non-public schools, and so to consider those as alternative placements, prior to completing the child's IEP.

The parents also allege that the IEP failed to provide their daughter with a FAPE. In this regard, it is noteworthy that IDEA does not articulate any specific level of educational benefits that must be provided through an IEP. As the United States Supreme Court has noted, IDEA does not require states to maximize the potential of disabled children; it is required only "to open the door of public education to handicapped children on appropriate terms," not "to guarantee any particular level of education once inside." <u>Walczak</u>, *supra*., 142 F.3d at 129 (citing <u>Rowley</u>, *supra*, 458 U.S. at 206). As the Second Circuit has noted, because public resources are not infinite, federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child." <u>Id</u>. (citing <u>Lenceford v. Dist. of Columbia Bd. Of Educ.</u>, 745 F. 2d 1577, 1583 (D.C. Cir. 1984)) (Ginsburg, J.).

Only if the parents prove that the IEP confers no educational benefit will a court go on to consider the other <u>Burlington</u> factors. <u>Id</u>. at 134.

The test for the parents' private placement is that it is appropriate, not that it is perfect. <u>M.S.</u>, 231 F. 3d at 105; <u>see also</u> <u>Warren G. v. Cumberland County Sch. Dist.</u>, 190 F. 3d 80, 84 (3d Cir. 1999). The parents satisfy their <u>Burlington</u> burden by showing that their unilateral placement offered an educational program that met their child's special needs. <u>Id</u>. at 102; <u>Walczak</u>, *supra*., 142 F. 3d at 149. The parents' unilateral placement need not have certified

special education teachers or an IEP for the disabled student in order to qualify as appropriate. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 14 (1993).

Moreover, while students with disabilities should be educated in the least restrictive environment, 20 U.S.C. § 1412(a)(5), parents are not held to the same strict standard of placement as are school districts. See M.S., *supra.*, 231 F. 3d at 105; see also Rafferty v. Cranston Pub. Sch. Comm., 315 F. 3d 21, 26-27 (1st Cir. 2002). While a court may consider the least restrictive environment issue, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement. Id. (citing Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss, 144 F. 3d 391, 400 (6th Cir. 1998)).

IDEA itself empowers a Court to consider material outside the administrative record. 20 U.S.C. § 1415 (i)(2)(B)(I)-(iii). No materials other than the administrative record have been forwarded to the court.[1]

**Factual and Procedural Background**

The parents' brief and moving papers make repeated references to problems with the 2003-04 and the 2004-05 school years. The parties stipulated that the impartial hearing was to cover only the 2004-05 school year (Tr. 16), and the SRO correctly concluded that claims relating to alleged inadequacies in the child's program during the 2003-04 school year were not properly before him. They are also not properly before this Court, and thus will not be addressed.

The SRO found the following facts, all of which are amply supported by the record:

Plaintiffs' daughter was diagnosed with pervasive developmental disorder as a preschool student. She received specialized preschool instruction and support services, including speech-language therapy, occupational therapy and Applied Behavioral Analysis (ABA). She attended the Keller School, a private, not-for-profit, publicly funded preschool for children with disabilities.

During the 2003-04 school year, the child attended kindergarten in the special class at Midland, as recommended by the defendant District's Committee on Special Education (CSE). The class, which had a recommended student to stuff ratio of 8:1+2 (eight students to one teacher plus two teachers' aides), contained four students, a full-time special education teacher and two aides. Related services included individual speech-language therapy once a week for 30 minutes, speech-language therapy twice a week in a group of three for 30 minutes, and occupational therapy twice a week in a group of three for 30 minutes.

_____

[1] The cross motions were made early this year. This decision would have been handed down much sooner if the administrative record had been forwarded to the court prior to September 18, 2006.

As part of its triennial reevaluation of C.S., the District administered a number of evaluative tests to the child in the autumn of 2003. The first of these was the Wechsler Preschool and Primary Scales of Intelligence – Third Edition (WPPSI-III), on which the child scored a verbal IQ of 57 (.2 percentile), a performance IQ of 49 ( < .01 percentile) and a full-scale IQ of 49 (< .01 percentile). Testing demonstrated significant weaknesses in the child's ability to combine motor, perceptual skill, speed to a task, and the ability to follow directions – thereby impacting her cognitive functioning and overall performance in school.

The mother completed the Vineland Adaptive Behavior Scales: Interview Edition in September 2003. The results indicated that C.S., who was at that time 5 years and 7 months old, evidenced moderate delays in communications and a mild delay in daily living skills. Communication was her greatest area of weakness. The child was able to take a bath with assistance, put toys away when asked and was toilet trained through the night. She could imitate simple adult movements, show a desire to please others, and reach for a familiar person. She could not help with chores, understand the function of money, answer the telephone properly, play with toys alone, interact with others for a simple game or imitate a complex task.

A classroom observation conducted as part of the psychological evaluation revealed that C.S. was able to follow simple one-step directions, answer simple questions, read, identify words in print, complete certain math tasks independently, state the day of the week, and follow simple calendar patterns using colors. However, she did not spontaneously generate language. Her play skills were repetitive and perseverative. From time to time she threw herself to the floor, but was able to be redirected by the teacher.

The child also took the Wechsler Individual Achievement Test – II (WIAT-II). Her math, reading and written subject test scores placed her close to grade level. Indeed, on the word-reading subtest, C.S. achieved a superior range score of 127, placing her in the 97th percentile, and on the spelling subtest she scored 135, which put her in the 99th percentile. She fell below grade level on listening comprehension and math reasoning, where she placed in the 13th and 10th percentiles, respectively. The child's teacher reported that her scores on the WIAT-II were consistent with her performance in the classroom. The teacher also indicated that the child had difficulty performing tasks that were presented in more complex language.

On a Clinical Evaluation of Language Functions – Preschool, administered in November 2003, C.S. scored only in the first percentile in receptive language, and no score could be calculated for expressive language. The evaluator concluded that the child demonstrated serious receptive and expressive language delays, with weaknesses in the areas of attending to language, processing auditory information and spontaneous expressive language skills. This made it difficult for C.S. to follow a story or mainstream whole class activities, although she was able to follow simple directions, understand routines and greet familiar people when they entered a room.

An occupational therapist concluded, after evaluation in November 2003, that plaintiffs' daughter demonstrated several high level skill areas, but that she demonstrated difficulty

processing sensory information at times, leading to frustration behavior.

No Functional Behavioral Assessment was performed with this round of tests.

The CSE met with plaintiffs for the child's triennial review in January 2004, and decided that her program would remain unchanged for the remainder of the 2003-04 school year, with mainstreaming where appropriate. As the year progressed, the girl went into the mainstream kindergarten class on an increasing basis.

The CSE met for the girl's annual review on April 30, 2004. The parents were in attendance. Her special education teacher, Dr. Catherine Sales,[2] reported that the child had academic strengths and had made progress in class in a number of different areas and on each of her IEP goals. Dr. Sales introduced daily graphs that charted the child's progress. The mainstream kindergarten teacher indicated that the child had participated in the mainstream class and had a positive experience. Both teachers noted continuing delay and difficulty in the area of speech-language, although there had been some progress.

The final IEP report indicated that C.S. had mastered or completed thirteen out of fourteen academic objectives and demonstrated progress on one. She had mastered four of the six social/emotional objectives and progressed on the other two. She completed eighteen motor objectives and demonstrated satisfactory progress on six. (District Ex. 16)

At the April meeting, the CSE made a preliminary recommendation for the 2004-05 school year of placement in a special class with a student to staff ratio of 8:1+2 for half the day, and regular first grade for half the day. A shadow aide assigned to two children was to assist C.S. in the mainstream portion of her day. The CSE also recommended individual speech-language therapy once a week for 30 minutes and group speech therapy (group of three) twice a week for 30 minutes, as well as occupational therapy in a group of twice a week for 30 minutes and an individual session once a week for 30 minutes. Additionally, the CSE recommended one hour per month of parent training to assist in the transfer and generalization of skills the child acquired at school to the home. As an extended school year program, the CSE recommended speech-language therapy for 30 minutes twice a week in a group of three during the summer.

The parents disagreed with the CSE's recommended program. They expressed concern about the amount of experience the child's new special class teacher had with autistic children. They also felt that the gap between their daughter and other children her age was expanding, and

_____

[2] As the defendant District notes (Br. At 2), Dr. Sales has been a special education teacher in the District for three years; was employed for thirteen years as a teacher and supervisor at the Keller pre-school program that C.S. attended ; has provided home-based tutoring to children for 16 years; and is an adjunct professor at Fordham, where she teaches graduate level courses in special education assessment and environments for managing behaviors. She holds her doctorate in Special Education from Columbia University.

that the girl was not generalizing and transferring what she was learning.

After the CSE had delivered its recommendation, but before finalization of the IEP, the special class teacher (Dr. Sales) administered a Functional Behavioral Assessment (FBA). The immediate impetus for the administration of this test was the persistence of C.S.'s "self-talk," "air writing" and other stereotypical autistic behaviors. Dr. Sales had reported regression following a long weekend in May; she noted that C. was less responsive, interactive and engaged than she had been in April.

The FBA identified the girl's problematic behaviors. It identified the triggers for self-talk and air writing as "high difficulty demand" and "transition task" and "transition setting," while throwing materials and falling to the floor were triggered by any level of demand (low or high) and transition tasks. The first two behaviors tended to occur during instruction (small or large group), in crowded or noisy settings, or during structured activity. The throwing and falling tended to accompany independent seat work and small group instruction. The FBA set behavioral goals for the girl, and outlined strategies for teaching her those behavioral goals, including verbal and textual prompts. (District Ex. 15).

After the April meeting, but prior to the finalization of the IEP, the CSE received C.S.'s year end reports. They indicated that plaintiffs' daughter made progress during the school year. The progress report (Parent Ex. 34) indicated that she had done "very well" in accomplishing her study skill goal and objective; that she had mastered the majority of her reading and writing goals and objectives and all of her mathematics goals and objectives. At the end of the year, the child had mastered the objective relating to the use of greetings and introductions, making progress in establishing eye contact, understood the correct use of "no" and "not," had the ability to use and understand simple yes or not questions, would understand and use basic "Wh" questions, could initiate conversational utterances and experienced a decrease in echolalic speech.  C.S. was progressing in similar fashion on her  social, emotional and behavioral goals and objectives: she could identify gender, play and share materials without being frustrated, play cooperatively with others, and participate to a degree in associative play. She also made some progress in being able to initiate and maintain social interaction. And she completed 18 separate occupational therapy objectives, while making satisfactory progress in six of seven others.

Communicating in writing or verbally remained a general area of difficulty, although C.S. appeared to like to write and could do so with prompts. She was able to complete sentences that were started for her and she could follow directions better. She was able to predict various routines, was more independent in her work, and could complete simple worksheets without needing a teacher's help to keep her on task.

A written report from the special education teacher (Dist. Ex. 17) concluded that the child was answering questions while looking at the teacher during group lessons; attending better to class activities, sitting appropriately in class; and responding more quickly to cues relating to her behavior. She exhibited less self-stimulatory behavior. With the help of her aide, she was able to participate in "active response" lessons and activities in the mainstream classroom. She could

follow daily routines and multi-step directions. She was easily motivated by praise, but tangible
reinforcers were needed when she was presented with a more difficult task. The report noted that
it was "extremely important" that goals worked on at school were followed at home.

Plaintiffs, dissatisfied, arranged for private observation of the girl in her special education
class and in the mainstream class for part of a day in May 2004. They also obtained a private
psychological and educational evaluation of their daughter in July 2004 (Dist. Ex. 18, 198). The
results of the cognitive testing were consistent with the test results obtained by the District
earlier in the school year (Dist. Ex. 4, pp. 2-3). The private evaluator recommended, among other
things, that the girl attend a 12 month program in a school specializing in Applied Behavioral
Analysis (ABA) and that the program include a minimum of 15 hours a week of ABA at home.
Parent training was to be provided to help plaintiffs understand how to use behavioral
reinforcement with their daughter, especially pertaining to her communication.

The District's CSE met on July 13, 2004 to discuss, *inter alia*, the recently-completed
FBA and the recommendations of the private evaluators. Plaintiffs and their attorney attended
the meeting. The CSE also reviewed the child's speech-language triennial evaluation, a
subsequent March 2004 Occupational Therapy report, and the November 2003 triennial
psychological and educational evaluations. After reviewing these inputs, the IEP that had been
proposed in April was modified by reducing the student to staff ratio in the first grade special
class to reflect anticipated enrollment (from 8:1+2 to 6:1+2); adding a requirement that C.S.
would receive a minimum of 60 minutes of instruction per day to meet language needs (which
would occur during her time in the first grade special education classroom); increasing the
frequency of parent training to 30 minutes per week; adding a speech-language consultation with
the parents for an hour a month; adding a special education consultation for two hours per week
in order to provide a liaison for services and consultation in behavior management and
instructional modification for the regular first grade classroom teacher. Dr. Sales was to provide
this consultation for the first grade teachers.

The revised IEP carried over the relevant goals and objectives that had appeared in the
IEP that was proposed in April, including those with respect to the types of behavior addressed
by the FBA (which had been conducted after the April IEP was formulated) and the strategies
(including interventions) for dealing with those behaviors. The CSE also augmented the
extended school year program by providing for three hours of ABA per day to a maximum of 15
hours per week, as well as additional speech-language and occupational therapy.

Plaintiffs rejected the IEP and unilaterally placed their daughter at Deveraux Millwood
for the summer of 2004 and the 2004-05 school year. They sought an impartial hearing and
reimbursement for tuition, transportation and related expenses for both the summer and school
year programs. This included separate amounts for speech and language and occupational
therapy services, and for supplemental extended day ABA services during the school year.

An impartial hearing was held on October 5, 6, 12, 13, 18, November 1, December 6, 7
and 21. On the first day of the hearing, petitioners withdrew their claim for reimbursement for

summer 2004 services and stipulated that their claims were limited to the 2004-05 school year
and the cost of extended ABA services during that school year. The parties agreed that
transportation was not an issue. (Tr. 15-21).

 The IHO rendered a decision on February 24, 2005. He concluded that the services
offered by defendant District were appropriate and denied the parents' request for
reimbursement. Because he concluded that the District (on whom, in the pre-Schaffer era, he
erroneously placed the burden) had proved the adequacy of the IEP, the IHO quite properly did
not address the appropriateness of Deveraux Millwood as a placement for their daughter.

 Plaintiffs then took an appeal to the SRO, who affirmed in all respects the decision of the
IHO. He concluded, as had the IHO, that the parents had not demonstrated any procedural error
that resulted in the loss of the child's educational opportunity or seriously infringed on the
parents' opportunity to participate in the IEP formation. Focusing specifically on the July 13,
2004 IEP (which was the operative IEP), the SRO concluded that it reflected the results of the
evaluations that had been performed on the child and analyses of her progress during the
preceding year. The IEP properly identified her needs as of the time it was finalized (July, not
April) and properly described those needs. It established goals and short-term instructional
objectives in all relevant areas (speech-language, social emotional, behavioral, motor). And it
provided for numerous non-classroom auxiliary services (see below). (SRO Decision at 9).

 The parents' specific contentions on appeal to the SRO were as follows:

 (1) *The District did not properly assess the child's "present" levels of performance as
related to "interfering behaviors" before developing the IEP*

 The SRO found, with substantial evidentiary support, that the FBA was conducted prior
to the July 13, 2004 meeting at which the child's ultimate IEP was formulated, and that the
child's interfering behaviors and the results of the FBA were discussed at that meeting. He noted
that the IEP specifically provided that the child needed support to maintain engagement, to
participate in group and one-to-one activities, and also to help guide her in appropriate behavior.
It contained specific objectives and relevant goals dealing with socially acceptable behavior in
the school environment, and it referred to a positive reinforcement plan and to other strategies to
address the child's interfering behaviors, including use of feedback and praise, extra time to
respond and complete tasks, encouragement to interact and use vocal language, reminders to stay
on task and redirection by cuing. (SRO Decision at 10, citing IEP, Dist. Ex. 3).[3]

 (2) *The District determined to place the child in the Rye City Schools and not in private
school prematurely and without first conducting an appropriate FBA.*

 The SRO concluded that this contention lacked merit. He found that the FBA was

---

[3]In the record that was forwarded to the court, the IEP is both  District Exhibit 3 and 4.

9

conducted prior to the finalization of the IEP (which occurred in July, not in April) and at a time when the child's behaviors warranted it. The SRO also concluded that the FBA met the requirements of 8 NYCRR 200.1(r), in that it identified the problem behavior, defined the behavior in concrete terms and identified the contextual factors that contributed to the behavior. (SRO Decision at 10, citing FBA, Dist. Ex. 15).

(3) *The IEP for the 2004-05 year contained inadequate goals and objectives that were not sufficiently specific and measurable*.

The SRO agreed with the IHO that the goals in the IEP were overly broad. However, the SRO also agreed with the IHO that this technical deficiency in the IEP could be excused because the short-term educational objectives were measurable and sufficiently specific to enable the child's teachers and the parents to understand the CSE's expectations, as well as what the child should be doing over the course of the school year.

(4) *The CSE did not consider the "full continuum" of services for the 2004-05 school year*.

The SRO concluded that the IEP provided "appropriate" special education services to C.S. – the extended school year program for the summer 2004 term, placement in a small first grade special education class with a 2:1 shadow aide, individual and small group speech-language and occupational therapy as related services, weekly parent training, special consultative training for her mainstream teacher and special coordination of the child's entire program and information for the classroom teacher about behavior management and instructional modification. (SRO Decision at 9).

The SRO did not discuss the fact that the CSE apparently did not consider placing the child in a private school, which appears to have been what the parents meant by the "full continuum of services."  The parents had asked that the child's records be sent to private schools.

Judicial Review

All of the SRO's fact findings are amply supported by the evidence he cited. The SRO's decision is exactly the sort of decision whose findings of fact are due appropriate deference by this Court, which is not an expert on education or autism. I therefore adopt the SRO's findings of fact as my own.

The parents are correct that a court is not to rubber stamp an SRO's conclusions, and in particular that issues of law are not subject to the same degree of deference as findings of fact. With that in mind, I turn to the issues raised by plaintiffs before this court.

**Issues on Appeal to This Court**

On appeal to this court, the parents press the following objections to the SRO's ruling:

10

**(1) Rye Failed to Develop Appropriate Goals and Objectives for C.S.'s IEP and the Child Failed to Make Meaningful Progress**.

Insofar as we are looking at the issue of progress, the SRO specifically found, as a matter of fact, that C.S. had made substantial progress during her kindergarten year (2003-04) in the public school. (SRO Decision at 9). As is apparent from the parents' brief (Br. At 9), their argument here is that the SRO erred in relying on the school's "unreliable" progress reports, rather than on the evidence developed by the parents through the McCarton Center (its privately-retained evaluator) and videotapes taken of the girl while she was exhibiting problematic (or, more properly, stereotypical) autistic behaviors – behaviors that the girls' special education teacher admitted were more apparent at the end of the 2003-04 school year. (T. 320-31).

The problem with plaintiffs' argument is that this sort of weighing of conflicting evidence is exactly the sort of area in which I am required to defer to the SRO – the education professional – rather than pretend to transform myself into some sort of educational specialist. The experts who saw the child every day – one of whom, Dr. Sales (a teacher with impeccable credentials), literally graphed the girl's performance on a daily basis – concluded that, on the whole, the girl had made progress during the course of the year, even though stereotypical behaviors emerged toward the end of the year.  There was substantial and credible evidence to back up their conclusion. The record reveals, for example, that C.S. made considerable academic progress during the year, exceeding the achievements of some of her non-disabled peers in at least one area (reading) during her kindergarten year.

The stereotypical behaviors were disturbing to everyone –  a report from the child's teacher about the emergence of those behaviors  triggered the preparation of the FBA and was one reason why the CSE reevaluated its April recommendations in July. But the behavior was not overly disruptive to the educational process. The child was removed from her classroom and redirected by the classroom aide fewer than five times, and when she was removed, she was always able to come back to the classroom during the same day.  The reemergence of stereotypical behaviors was, therefore, not deemed sufficient to overturn the earlier recommendation to place the child in the public school. It did, however, play into the decision to modify the IEP to provide for a more closely supervised (lower teacher:pupil ratio) environment for C.S. – disproving plaintiffs' allegation that the CSE did not consider the issue.

The experts from McCarton Center, who opined that C.S. had not made substantial progress during her kindergarten year, did not have the same degree of interaction with the child and never saw her except at the very end of the school yea.  They did not have the same opportunity to measure the girls' progress over the course of the year.

As for the "compelling videotape evidence," it reflects only what occurred at particular times when the camera was on. The IHO, who sees this sort of evidence all the time, specifically found that the videotapes were not as clear as the parents argued they were, and sometimes did not show what the parents said they showed. (IHO Decision at 11). Moreover, he concluded that there was not a 1:1 correspondence between what the videotape showed and what the child

11

allegedly mastered during the preceding school year. (IHO Decision at 11). The parents made the videos and no doubt turned on the camera when it suited them – one of the videos, according to the District, was made at the child's bedtime, not as part of a structured routine of the sort that C.S. would experience at school. Finally, and importantly, the videotapes were not taken prior to the development of the child's IEP. They were made in October 2004, during the course of the hearing, and months after the parents had rejected the CSE's suggestions – including its suggestion for summer intervention. (IHO Decision at 16).

The SRO concurred with the IHO's view of the evidence. All the evidence to which plaintiffs cite was in the record before the IHO and the SRO. The decisions of both administrative judges indicate that it was considered. No new or additional evidence has been provided to this court. The findings made by the professional administrative judges are entitled to Walczak deference, and no argument propounded by the parents persuades me otherwise.

Insofar as we are addressing the issue of appropriate goals and objectives, the issue is somewhat different. Both the IHO and the SRO concluded that the IEP was deficient in its statement of annual goals for C.S. (IHO Decision at 11; SRO Decision at 10). The IHO concluded that the goal statements were overly broad in that they did not identify the extent or level to which the student would demonstrate identified skills, behavior or knowledge – they only said that she would show improvement in each of these areas. However, he found that the IEP as a whole was satisfactory, because the short-term objectives concretely outlined targeted sub-skills, identified criteria for mastery, set forth procedures to be used for measuring progress and specified a date by which that progress was to be made. The SRO affirmed this conclusion.

I do not find that the administrative judges' determination in this regard to be erroneous, either as a matter of fact or of law. The court has reviewed the IEP in detail. The objectives are quite specific concerning what the child needed to be able to do and when she needed to be able to do it. To cite a few examples: Under the heading "READING," the student was to "Demonstrate the ability to listen to stories read by the teacher and name two facts in the book when shown pictures with 80% mastery across five books, evaluated by utilizing recorded observations, as assessed by the special education teacher, by March 15." Under the heading WRITING, the child was to "Demonstrate the ability to apply the rules of capitalization (for proper nouns, beginning of sentences, and within sentences) to her written work with 75% mastery at an independent level, evaluated by classwork, as assessed by the special education teacher, by June 15." And under MATHEMATICS, she was to "Correctly solve simple addition facts for quantities 1 - 10 utilizing concrete materials with 70% mastery at an independent level, evaluated by classwork, as assessed by the special education teacher, by January 15." (Dist. Ex. 3, page 7).  It is, frankly, difficult for the court to imagine how much more specific the District could be concerning its goals and objectives for the student's continued educational progress.[4]

---

[4] Given the specificity of the objectives, the court is hard-pressed to understand how much more "specific" the goals could possibly have been.

The parents challenge the administrative judges' determination concerning the adequacy of the short term objectives on the ground that some of them were not short-term enough (5 to 8 months). No authority of which this court is aware specifies that "short-term" needs to be measured in a span of a few weeks, or no more than a couple of months; significantly, none is cited. The subject child is autistic, and it appears that the amount of time needed to reach the objectives is based on the educators' assessment of her ability to achieve mastery of the relevant skills. I perceive no error in their conclusion, and indeed, nothing except a barebones challenge to the amount of time given to C.S. to achieve the objectives is suggested by the parents.

The IHO found that there was credible evidence to support an inference that C.S.'s interaction with non-disabled children with whom she mainstreamed was not always properly supervised. He concluded, however, that the answer was better supervision, rather than depriving the child of an opportunity to interact with her non-disabled peers. Plaintiffs do not address this finding and this Court cannot say that it is clearly erroneous as a matter of either fact or law.

### (2) Rye Impermissibly "Predetermined" Placement Issues

Plaintiffs argue that Rye "predetermined" C.S.'s placement before adequately assessing her "present-level" behaviors, including her interfering behaviors. This argument fails because its factual predicate is not borne out by the record. All the evidence in the record indicates that the IEP and the placement decision were not finalized until July 2004, after the District completed the FBA (which happened in June).

What plaintiffs propose, in essence, is that a district not suggest an outcome in a first draft IEP, because if that turns out to be the CSE's final recommendation, the final decision will be subject to challenge as "predetermined."  Any such attitude by the courts will inevitably lead to gamesmanship in the preparation of IEPs by CSEs, with the district withholding points of view that ought to be out on the table and subject to discussion and parental challenge (which may or may not be successful) prior to the document's finalization. An IEP is intended to be an evolutionary document; as was the case here, it is subject to revision based on additional testing or developments that occur prior to its finalization. The District did not act wrongly by suggesting  a public school placement for C.S. in April, before all the testing was finalized; rather, it would have been wrong to refuse to indicate to the parents where it appeared the data were leading. The District would also have acted wrongly if it had not responded to the report of the child's classroom teacher concerning the re-emergence of stereotypical behaviors by re-evaluating the CSE's earlier conclusion.

As it is, the parents obtained substantial additional testing (the FBA; private testing) and year-end reports prior to the finalization of the IEP. The record clearly reveals that all this material was considered at the July 13 meeting. No evidence in the record suggests that the District would have refused to alter its April recommendations if the CSE's assessment of the FBA or the private testing had been different. Indeed, the CSE did alter its recommendations; it simply did not alter them to eliminate the public school placement.

13

**(3) Rye Failed to Consider Full Continuum/Least Restrictive Placement**

Plaintiffs argue that the defendant District failed to consider the full continuum of possible placements for their daughter by declining the parents' request that they send her materials to private schools. The District counters that the parents fail to give sufficient weight to IDEA's mandate that the student be placed in the least restrictive environment, and to the evidence in the record (including evidence from witnesses from Deveraux) that C.S. needed access to non-disabled peers.

The parents' position rests on the proposition that a school district is required, as part of its assessment of how best to provide for a child's education, to canvass private schools for possible placements if so requested by the parents. That is a faulty reading of IDEA. The law requires the district to evaluate the child's needs and to determine what is necessary to afford the child a FAPE. If it appears that the district is not in a position to provide those services in the public school setting, then (and only then) must it place the child (at public expense) in a private school that can provide those services. But if the district can supply the needed services, then the public school is the preferred venue for educating the child. Nothing in IDEA compels the school district to look for private school options if the CSE, having identified the services needed by the child, concludes that those services can be provided in the public school.

IDEA views private school as a last resort. The law expresses a clear preference for placing a child in the "least restrictive environment" – that is, in an environment where they will be educated with non-disabled peers to the maximum extent appropriate. A child may only be removed into a more restrictive environment when the nature and severity of her disability is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved. 20 U.S.C. §1412(a)(5)(A); 34 C.F.R. 300.550(a)(2); Briggs v. Bd. of Educ., 882 F. 2d 688 (2d Cir. 1989). This is true even if a child with disabilities might make greater academic progress in a more restrictive environment. The CSE must consider the unique benefits, academic and otherwise, that a student receives by remaining with non-disabled peers.

The record reveals that C.S. was making academic progress in the public school, spending half of each day in a special education program and half of each day mainstreamed with an aide. According to Dr. Sales, she was making friends in kindergarten and was starting to imitate the behavior of non-disabled peers. She could also read, which many of the "regular" kindergartners could not do. (T. 354-56). There is no evidence that the child was making learning difficult or impossible for herself or for other students. Even with the re-emergence of stereotypical behaviors at the end of the school year, she rarely needed to be removed from the class and was able to refocus when her attention wandered or she engaged in inappropriate or stereotypical behaviors.

C.S. is exactly the sort of student for whom IDEA mandates education in the public setting – and for whom extensive or premature consideration of schooling in an exclusively disabled student environment (such as Deveraux Millwood) would be inappropriate as a matter of law.

**(4) Rye Failed to Provide a Timely FBA Constituted a FAPE**

The failure to properly consider and assess behavior that interferes with or impedes a child's learning or the learning of others violates the student's right to a FAPE.

Plaintiffs contend that Rye impermissibly denied C.S. a FAPE in both 2003-04 and 2004-05 by failing to perform a complete and proper FBA.

The parents' allegation that the defendant District's failure to conduct an FBA during the 2003-04 school year constituted a FAPE deprivation for that school year must be disregarded. The parents expressly stipulated at the outset of the hearing that the only school year at issue was the 2004-05 school year. (Tr. 15-19)  Therefore, the issue of 2003-04 was not the subject of an administrative hearing. Having failed to exhaust their administrative remedies, the parents cannot now bring the issue to this Court.

The parents complain that the FBA developed in June 2004 was defective, both because it was not done until June 2004 and because it was not a "true" FBA, in that it  failed to include data about the frequency of and precursors to C.S.'s interfering behaviors, so as to permit preparation of a suitable Behavioral Intervention Plan (BIP).

The Regulations of the Commissioner of Education at 8-A NYCRR Section 200.1(r) define a functional behavioral assessment as "The process of determining why the student engages in behaviors that impeded learning and how the student's behavior relates to the environment. The [FBA] includes, but is not limited to, the identification of the problem behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and effective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it."

The FBA prepared by the District (District Ex. 15) contained all the required elements of an FBA, as the SRO specifically found. It set forth the reason for the referral, identified the problem behaviors and their triggers, concurrences and consequences. It indicated what negative reinforcements cause C.S. to maintain the behaviors. It set behavioral goals, listed eight strategies for helping the girl achieve those goals, and devised "prompts" to use when advising her about what was expected of her. While there were inappropriate behaviors (throwing materials, falling to the floor), they did not occur while the child was mainstreamed and – more significantly – they did not interfere with her learning in the District. Teachers found that C.S. could  be refocused or redirected when she began engaging in inappropriate behaviors. (T:607, see also T:1616, 1715). The parents themselves testified that their daughter could be distracted to stop from engaging in repetitive behaviors. (T. 1052).

The parents claim that the FBA did not comply with the Commissioner's regulations because it did not include data on the frequency with which she exhibited her distracting

behaviors. The state regulations do not specifically mandate that the frequency of behavior be noted on a FBA. The child's home supervisor did not believe that there was any need to take data on those behaviors, because C.S. was so easily redirected back to appropriate activity. (T. 2204-05). Witnesses from the child's private school – where the girl continues to display inappropriate behaviors from time to time – confirmed the fact that C.S.'s stereotypical behaviors were infrequent and that when they were exhibited she  could easily be returned to task. (T: 1616, 1715). For that reason, the Deveraux School did not have any data on their frequency, either. (T: 1615-16).

The parents' concern over their daughter's exhibition of distracting behaviors is perfectly normal and natural. However, there is no evidence that the behaviors actually interfere with their daughter's ability to make educational progress, because she could so easily be refocused.  It is the ability to make educational progress – not simply the fact of inappropriate behavior – that is the concern of the IDEA.

Both the IHO and the SRO concluded that the FBA conducted prior to the formulation of the July IEP met the Commissioner's requirements. I see no error in their conclusion..

Other Issues

The District has, as a precautionary matter, briefed several other issues, including the propriety of the special education class into which C.S. was placed and the propriety of the parents' unilateral placement at Deveraux Millwood. However, these issues were either not raised by the parents on appeal or are not appropriate for consideration because the Court is prepared to sustain the SRO's (and IHO's) determination that the IEP devised by the District afforded the child a FAPE.

Because the parents have not met their burden of demonstrating that the SRO's decision was erroneous, there is no need to address the propriety of the school chosen by the parents as an alternative placement, or to discuss the equities.

**Conclusion**

The District's cross motion for summary judgment is granted, and the determination of the SRO is affirmed. The complaint is dismissed with prejudice.

This constitutes the Decision and Order of the Court.

Dated: September 26, 2006.


_____
U.S.D.J.

**Conclusion**

The District's cross motion for summary judgment is granted, and the determination of the SRO is affirmed. The complaint is dismissed with prejudice.

This constitutes the Decision and Order of the Court.

Dated: September 26, 2006.

_____
U.S.D.J.

BY FAX TO ALL COUNSEL